UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| COALITION FOR SPIRITUAL AND PUBLIC LEADERSHIP, FR. LARRY DOWLING, SR. JEREMY MIDURA, FR. DENNIS BERRY, FR. DAN HARTNETT, and MICHAEL N. OKIŃCZYC-CRUZ, <br><br> Plaintiffs, <br><br> v. <br><br> KRISTI NOEM, Secretary of Homeland Security, *et al.*, <br><br> Defendants. | No. 25 C 14168 <br><br> Judge Gettleman |

**<u>DEFENDANTS' RESPONSE TO MOTION FOR PRELIMINARY INJUNCTION</u>**

After 15 years of cordial relations, plaintiffs now sue U.S. Immigration and Customs Enforcement (ICE), claiming that visitation practices at the Broadview service staging facility violated their rights under the Free Exercise Clause, the Religious Freedom and Restoration Act, and the Religious Land Use and Institutionalized Person Act. But even taking their factual allegations as true, plaintiffs' complaint is missing key elements to satisfy those claims. Plaintiffs do not allege that *they* were excluded while *other* visitors were allowed. Nor do they allege that ICE implemented anything other than a temporary, operationally necessary restriction, which would no doubt survive rational basis review and cannot be said to have "substantially" burdened their religion. Because ICE's October and November visitation denials were pursuant to a *neutral* and *temporary* suspension of *all* visitors, which was operationally necessary due to a dramatic influx of "Midway Blitz" detainees, plaintiffs are unlikely to succeed on the merits. Therefore, their motion for preliminary injunction should be denied.

**Factual Background**

The following facts are taken from plaintiffs' complaint and assumed to be true for purposes of this filing and the contemporaneously filed motion to dismiss.

I. **Uncontroversial Facilitation of Pastoral Care from 2010 to 2025**

For 15 years, from 2010 to 2025, the religious practitioners referenced in the complaint enjoyed a largely cooperative (or at least uncontroversial) relationship with ICE. As described in the complaint, Sisters JoAnn Persch and Pat Murphy conducted weekly visits to the Broadview facility from 2010 to 2020, meeting with detainees and their families at 4:00 a.m. every Friday. Dkt. 1 ¶ 33. ICE's Broadview facility is a service staging facility where civil immigration arrestees are processed and temporarily staged before being transported to a detention facility, other holding facility or, in certain circumstances, for removal from the United States. Sisters Persch and Murphy also met with ICE detainees at three county jails that housed ICE detainees —Kenosha, Wisconsin; Dodge County, Wisconsin; and Kankakee, Illinois. Dkt. 1 ¶ 30. The only thing that eventually stopped the sisters' visits was the COVID-19 lockdowns in 2020. Dkt. 1 ¶ 33. Even still, interactions between the sisters and ICE remained cooperative. The sisters were given access to ICE detainees at Broadview and the above-mentioned jails via Zoom. *Id.* ¶ 33. And Broadview management reached out to the sisters requesting their assistance when they learned that a soon-to-be released detainee lacked housing. *Id.* ¶ 34.

As the COVID-19 lockdowns ended in 2022, the sisters resumed praying at Broadview. This time, they positioned themselves (and their accompanying prayer groups) at the base of the steps leading into the facility. Cordial relations with the ICE continued for the next three years until 2025. *Id*. ¶ 3.

Sisters JoAnn Persch and Pat Murphy are both sadly recently deceased (and were never named as plaintiffs in this case). None of the named plaintiffs allege that they ever attempted to visit the Bradview facility before the fall of 2025.

## II. Operation Midway Blitz: Plaintiffs are Denied Visitation Due to Emergent Operational Concerns

In the fall of 2025, ICE launched Operation Midway Blitz, targeting immigration enforcement in the Chicagoland area. Plaintiffs allege that sometime in September 2025, while the sisters and their prayer group gathered at the base of Broadview facilities' steps, "ICE agents in camouflage uniforms and masks" dispersed them. *Id.* ¶ 36. Shortly thereafter, fencing was installed around the facility, preventing the sisters from conducting their prayer groups in the same location. *Id.*

After the launch of Operation Midway Blitz, plaintiffs requested—for the first time—access to the detainees *within* the Broadview facility. The complaint refers to two occasions when plaintiffs wanted to be allowed inside the facility and were denied. First, plaintiffs asked to pray with, and provide Holy Communion to, detainees on October 11, 2025, as the final stop of a 1,000-member "Eucharistic Procession" from St. Eulalia Church to the Broadview facility. Dkt. 1 ¶¶ 2, 12. When plaintiffs reached the facility's gates that day, they asked the Illinois State Police officers stationed outside the facility to relay the request for admittance to ICE personnel at the facility. The officers apparently relayed the request but reported back that access to the facility was denied. Dkt. 1 ¶ 4.

Second, on November 1, 2025, plaintiffs held a mass down the block from the Broadview facility and requested permission to administer Holy Communion to detainees inside the facility that day. The agency denied the request based on safety and security concerns. Dkt. 1 ¶ 7. Dkt. 1 ¶ 12.

In addition to those two requests, plaintiffs also made attempts to coordinate (more generally) with ICE personnel regarding visitation and the provision of pastoral care. *See id.* ¶¶ 47-58 (referring to plaintiffs attempts to confer with ICE officials via letter, email, and office visits to secure advance permission for entry). Those attempts at contact all took place during October and November 2025. *Id.* ICE either denied the requests or did not respond. *Id.*

As alleged in the complaint, plaintiffs' attempts at visitation were limited to October and November 2025.

## Argument

Plaintiffs now allege that the temporary visitation restrictions that ICE put in place soon after the launch of Operation Midway Blitz violated their right to freely practice their religion. Plaintiffs seek a preliminary injunction ordering ICE to grant them "immediate access" to the facility. Dkt. 8 at 7. But as laudable as plaintiffs' mission might be, they are not entitled to a preliminary injunction for the simple reason that their allegations fail to state any cause of action. The only attempts that plaintiffs made to visit the Broadview facility were right after the launch of Operation Midway Blitz, which (as the court well knows) led to an influx of detainees and unique operational demands for the staff at Broadview. Those couple of requests were denied because— at the time they were made—Broadview lacked the personnel required to facilitate visitation safety. Because plaintiffs allege nothing more than a neutral, temporary restriction, that can hardly be said to have substantially burdened their religion, they have not stated a claim for any violation of the religious freedom laws.

### I. Preliminary Injunction Standard

A preliminary injunction, "is an extraordinary and drastic remedy." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997). A plaintiff seeking a temporary restraining order must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of

preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The burden is on the plaintiff to make a "clear showing" demonstrating their entitlement to such relief. *Goodman v. Ill. Dep't of Fin. & Prof'l Regulation,* 430 F.3d 432, 437 (7th Cir. 2005).

## II. Standing

As an initial matter, the court may wish to understand whose rights are at issue. Plaintiffs contend that they have standing to assert their own rights as well as the rights of all of the detainees who might be processed at the Broadview facility. Dkt. 1 ¶ 8. But plaintiffs lack standing to assert the rights of the detainees.

It is a well-established rule that a litigant may assert only his own legal rights and interests and cannot rest a claim to relief on the legal rights or interests of third parties. *Singleton v. Wulff,* 428 U.S. 106, 113-14 (1976); *see also U.S. Dep't of Labor v. Triplett*, 494 U.S. 715, 720 (1990) (observing that "[t]his is generally so even when the very same allegedly illegal act that affects the litigant also affects a third party"). The prohibition on third-party claims is a prudential standing limitation that recognizes that claims are best prosecuted by those who actually have been injured, rather than by someone in their stead. *Massey v. Wheeler*, 221 F.3d 1030, 1035 (7th Cir. 2000). The Supreme Court has recognized a narrow exception to this doctrine, allowing third-party claims when the third-party plaintiff can show a close relationship between the first and third party and some obstacle to the first party's ability to protect his own interest. *See Powers v. Ohio*, 499 U.S. 400, 411 (1991); *Shimer v. Washington*, 100 F.3d 506, 508 (7th Cir. 1996).

In this case, plaintiffs' allegations fail to satisfy both the "close relationship" and the "obstacle" elements. As for close relationship, the element is not satisfied unless there is a "congruence of interests" between the litigant and the third party, such that "that the former is fully, or very nearly, as effective a proponent of the right as the latter." *Powers,* 499 U.S. at 414*;*

5

*Singleton*, 428 U.S. at 115. Courts are unlikely to find a congruence of interests where a third party seeks to assert the rights of a person who might assert them differently or prefer that they not be asserted at all. 13A Charles Alan Wright & Arther R. Miller, *Federal Practice & Procedure* § 3531.9.3 (3d ed.) ("[N]onparties actually may prefer that their rights not be enforced.") In this case, it is certainly safe to assume that some detainees who have moved through Broadview would welcome pastoral care from plaintiffs. And it is also fair to assume that other detainees would prefer *not* to convene with plaintiffs, either because they practice a different religion, they practice no religion at all, or they would simply rather get through the facility as quickly as possible rather than pause to pray. In any event, claims brought by the detainees themselves—rather than a small group of Catholic practitioners purporting to proceed on their behalf—would better frame the issues and raise an appropriately distinct case or controversy for the court to consider.

Along those lines, and relevant to the second element ("obstacle"), plaintiffs have not effectively alleged that there is any specific obstacle preventing Broadview detainees from proceeding on their own behalf. And indeed it would be difficult to reach that conclusion in light of the fact that some Broadview detainees are currently acting to protect their own interests in another case before this same court (but have elected not to bring claims relating to religious exercise). *Moreno Gonzalez v. Noem*, 25 C 13323; *see also Hodak v. City of St. Peters*, 535 F.3d 899 (8th Cir. 2008) (no "obstacle" where third party had shown himself able to vindicate his own rights); *Benjamin v. Aroostook Medical Center, Inc.*, 57 F.3d 101, 104-107 (1st Cir. 1995); *Wedges/Ledges of California, Inc. v. City of Phoenix, Ariz.*, 24 F.3d 56, 61-62 (9th Cir. 1994). For the above reasons, the plaintiffs lack standing to seek redress of any injuries beyond their own.

### III. Likelihood of Success on the Merits

The first thing that any plaintiff must establish in seeking the extraordinary remedy of a preliminary injunction is a likelihood of success on the merits. In this case, plaintiffs cannot

establish a likelihood of success because they have failed to adequately allege a violation of either (A) the Free Exercise clause, or (B) the Religious Freedom Restoration Act. They have also failed to establish standing to bring a claim under the Religious Land Use and Institutionalized Person Act. Each of those points is discussed in greater detail below.

### A. First Amendment Free Exercise Clause – Rational-Basis Review Applies

First, with respect to plaintiffs' Free Exercise claim, plaintiffs allege only that they were temporarily restricted from visiting the Broadview facility. And—importantly—they do not allege that they (as religious practitioners) were treated less favorably than any other prospective visitor. That does not state a Free Exercise claim.

In assessing whether a given restriction violates the free exercise clause, courts must first decide whether the law is either "neutral and of general applicability" (in which case, rational basis review applies) or whether, instead, the law *lacks* neutrality, either because it proceeds in a manner intolerant of religious beliefs or restricts practices because of their religious nature (in which case, strict scrutiny applies). *Employment Division v. Smith*, 494 U.S. 872 (1990) ("The right of free exercise does not relieve an individual of the obligation to comply with a valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes)"); *Fulton v. City of Philadelphia, Pennsylvania,* 141 S. Ct. 1868, 1877 (2021) (declining to overrule *Smith*); *Elim Romanian Pentecostal Church v. Pritzker*, 962 F.3d 341, 345 (7th Cir. 2020); *Ill. Bible Colleges Ass'n v. Anderson*, 870 F.3d 631, 639 (7th Cir. 2017).

In this case, plaintiffs' visitation requests following soon after the launch of Operation Midway Blitz were denied, like *all* requests for visitation were denied. The complaint alleges nothing beyond that. Because Broadview's temporary visitation restrictions were neutral and of general applicability, they are now subject to rational-basis review, requiring only that they were rationally related to a legitimate governmental purpose. *Vision Church v. Vill. of Long Grove*, 468

7

F.3d 975, 999 (7th Cir. 2006). And importantly, on rational basis review, the visitation restrictions carry a *presumption* of validity. *Lyng v. Automobile Workers*, 485 U.S. 360, 370, (1988). Plaintiffs bear the burden of negating "every conceivable basis which might support it." *Lehnhausen v. Lake Shore Auto Parts Co.*, 410 U.S. 356, 364 (1973) (cleaned up).

It is not hard to come up with a "conceivable basis" supporting the temporary visitation restrictions at Broadview in October and November 2025. Anyone who watched the Chicago evening news or spent any time on social media during that time would appreciate the intense operational demands facing the staff at Broadview. And anyone following the related lawsuit now before this court challenging the conditions of confinement at Broadview during the same period would understand that Broadview's staff was not, at that time, in a good position to facilitate visitation (which requires screening of visitors, provision of dedicated private space, and assignment of personnel to monitor the visitation). Because plaintiffs have failed to allege that the visitation restrictions they faced at that time were irrational, there is simply no cognizable Free Exercise claim. There can be no preliminary injunction, and the claim should be dismissed.

### B. RFRA (Religious Freedom Restoration Act)

Plaintiffs' attempts to state a claim under the Religious Freedom and Restoration Act are also unavailing. RFRA provides that the government "shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability" unless it demonstrates that the burden "(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1(a)-(b). To successfully mount a RFRA challenge and subject government action to strict scrutiny, a plaintiff must meet the initial hurdle of establishing that the government has substantially burdened his religious exercise. *Henderson v. Stanton*, 76 F. Supp. 2d 10, 14 (D.D.C. 1999). Only when that predicate has been established will the burden shift to the government to

8

show that the law or regulation is the least restrictive means to further a compelling interest. 42 U.S.C. §§ 2000bb–1(b), 2000bb–2(3); *Goodall by Goodall v. Stafford Country Sch. Bd.,* 60 F.3d 168, 172–73 (4th Cir. 1995) ("only governmental regulation that places a substantial burden on a plaintiff's religious activity must be justified by a compelling state interest").

Here plaintiffs fail to allege a "substantial burden" to their religious exercise. Substantial burden means "substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Thomas v. Review Bd.*, 450 U.S. 707, 718 (1981); *see also Holt v. Hobbs*, 574 U.S. 352 (finding such a burden where a Muslim prisoner was forced to choose between shaving his beard or facing serious disciplinary action); *Burwell v. Hobby Lobby Stores, Inc.,* 573 U.S. 682, 720-26 (2014) (concluding a substantial burden existed where employers were required, under threat of severe economic penalties, to provide insurance coverage for contraceptive methods that violated their religious beliefs). A mere inconvenience on the exercise of religious beliefs will generally not be considered a substantial burden. *Ulmann v. Anderson*, No. CIV. 02-405-JD, 2004 WL 883221 (D.N.H. Apr. 26, 2004) (prisoner spent nearly a year at the MCHC without alerting the staff that his religion demanded kosher meals and a tefillin for prayer. Under these circumstances, the defendants' failure to respond to his needs during the final twelve days of his detention at their facility did not impose a "substantial burden" on his religious exercise within the meaning of the RLUIPA); *Dunlap v. Losey*, 40 F. App'x 41 (6th Cir. 2002) (holding that confiscation of prisoner's hardcover Bibles for one month, "while making the practice of his religion somewhat more difficult, did not coerce him into action contrary to his beliefs, and did not state a claim under the RLUIPA," where he failed to follow up on his initial request for softcover Bible until "a few days before his transfer").

9

Moreover, when a restriction merely prohibits *one* of a multitude of methods of pursuing a religious tenant, and it does not force parties to engage in conduct that their religion forbids or prevent them from engaging in conduct their religion requires, those parties are not "substantially burdened." *Henderson v. Kennedy*, 253 F.3d 12, 16 (D.C. Cir. 2011); *see also Mahoney v. Doe*, 642 F.3d 1112, 1122 (D.C. Cir. 2011). For example, in *Henderson* and *Mahoney*, the plaintiffs challenged regulations that prevented individuals from selling T-shirts on the National Mall and regulations that prohibited "chalking" the sidewalk in a particular location in front of the White House. *Henderson*, 253 F.3d at 13-14; *Mahoney*, 642 F.3d at 1115. Both sets of plaintiffs argued that those regulations violated RFRA because they prevented plaintiffs from following the religious requirement that they spread the gospel. The Court ruled that neither regulation imposed a substantial burden because the regulations were, at most, "a restriction on one of a multitude of means" by which plaintiffs could proselytize, and other alternative means were still available. *Henderson*, 253 F.3d at 17; *Mahoney*, 642 F.3d at 1121-22; *see also Archdiocese of Washington v. Washington Metro. Area Transit Auth.,* 281 F. Supp. 3d 88, 114 (D.D.C. 2017) (transit rule restricting religious advertisements did not substantially burden plaintiffs' religious mandate to spread the gospel); *Weir v. Nix,* 114 F.3d 817 (8th Cir.1997) (considering alternatives in determining whether burden was "substantial"); *Bryant v. Gomez,* 46 F.3d 948 (9th Cir.1995) *Bryant,* 46 F.3d 948 (no "substantial burden" where alternatives were available).

As in *Henderson* and *Mahoney*, the plaintiffs' religious exercise in this case it not substantially burdened by the restrictions that were temporarily in effect at Broadview. Plaintiffs allege—and defendants accept—that they are religiously motivated to pray with, and administer Holy Communion to, other Catholics who find themselves subject to detention and removal. But plaintiffs do not allege that they are religiously compelled to engage in those activities in the

10

specific manner at issue here. The truth is that the religious practitioners referenced in the complaint have been granted access to the Broadview facility for many years. And even after the launch of Operation Midway Blitz, although access to Broadview was temporarily restricted, ICE detainees remained largely available to plaintiffs at other facilities. *See* 2011 Performance-Based National Detention Standards, rev. 2016 (PBNDS) (providing religious practitioners access to detainees in ICE detention facilities)[1]; *see Kikumura v. Hurley*, 242 F.3d 950, 961 n. 6 (10th Cir. 2001) (no "substantial burden" on prisoner's religious exercise where he was allowed pastoral visitation, but not by the particular pastor he requested); *see Cheffer v. Reno,* 55 F.3d 1517, 1522 (11th Cir.1995) (Freedom of Access to Clinic Entrances Act did not "substantially burden" activists' sincerely held religious belief that abortion was murder because it left ample avenues open for appellants to express their deeply-held belief elsewhere); *Werner v. McCotter,* 49 F.3d 1476, 1480 (10th Cir. 1995) (failure to provide Pentecostal services in prison did not substantially burden prisoners religious exercise; "Bryant has not given this court any basis for concluding that he cannot accomplish the mandates of his religion through [other] means").

In addition to the reasons offered above, it also worth noting that the named plaintiffs in this case never tried to visit Broadview before October 2025. (Only Sisters Persch and Murphy are alleged to have visited.) So if we take plaintiffs at their word that ministering to vulnerable Catholic immigrants is part of their religious exercise, it's fair to infer that there must be alternative means of engaging in that practice (otherwise, what were they doing before 2025?). Because Broadview (as a location) is itself not essential to the practice, a temporary visitation restriction at Broadview cannot be said to have posed a substantial burden. *Cf. Apache Stronghold v. United States*, 101 F.4th 1036 (2024) (plaintiff Western Apache Indians brought RFRA claim after being

---

[1] Available at https://www.ice.gov/doclib/detention-standards/2011/5-5.pdf

denied access to federally owned land that they alleged was of great spiritual value and indispensable to their religious worship).

The complaint fails to state a claim under RFRA, and a preliminary injunction would be inappropriate.

### C. RLUIPA (Religious Land Use and Institutionalized Person Act)

Finally, plaintiffs have also failed to state a claim under the Religious Land Use and Institutionalized Person Act. Plaintiffs' proceed on that claim on behalf of unnamed detainees at Broadview. Because they lack standing to assert the rights of those detainees (see section II above), the claim is nonjusticiable here.

### IV. Irreparable Harm and Public Interest

Because plaintiffs cannot establish that they are likely to succeed on the merits, the court need not address "irreparable harm" and "public interest." For the sake of completeness, however, defendant notes that plaintiffs' argument on both of those elements presumes that ICE's October and November visitation restrictions are meant to be permanent. But as discussed above, those restrictions were operationally necessary due to the launch of Operation Midway Blitz. Plaintiffs *speculate* that they will be denied visitation access on an ongoing basis, and they ask the court to hurriedly intervene on the basis of that same speculation. But the court should not "anticipate a question of constitutional law in advance of the necessity of deciding it." *Ashwander v. Tennessee Valley Auth.*, 297 U.S. 288, 346 (1936). And at very least, the court should allow the facts to develop such that they are properly framed for the court's consideration before it resorts to the extraordinary remedy of a preliminary injunction.

**Conclusion**

For the foregoing reasons, the court should deny plaintiffs' motion for a preliminary injunction and grant defendants' contemporaneously filed motion to dismiss.

    Respectfully submitted,

    ANDREW S. BOUTROS
    United States Attorney

    By: s/ Sarah F. Terman
        SARAH F. TERMAN
        Assistant United States Attorney
        219 South Dearborn Street
        Chicago, Illinois 60604
        (312) 469-6201
        sarah.terman@usdoj.gov