UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| COALITION FOR SPIRITUAL AND PUBLIC LEADERSHIP, FR. LARRY DOWLING, SR. JEREMY MIDURA, F. DENNIS BERRY, FR. DAN HARTNETT, and MICHAEL N. OKIŃCZYC-CRUZ,<br><br>Plaintiffs,<br><br>-against-<br><br>KRISTI NOEM, TODD LYONS, MARCOS CHARLES, RUSSELL HOTT, RODNEY S. SCOTT, GREGORY BOVINO, PAMELA BONDI, U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. DEPARTMENT OF JUSTICE, and DONALD J. TRUMP,<br><br>Defendants. | Civil Action No. 1:25-cv-14168<br><br>Hon. Robert. W. Gettleman |

**PLAINTIFFS' REPLY TO DEFENDANTS' RESPONSE
TO MOTION FOR PRELIMINARY INJUNCTION**

## PRELIMINARY STATEMENT

The government's justification for denying Plaintiffs' requests to pray and minister outside and inside the U.S. Immigration and Customs ("ICE") facility in Broadview, Illinois, has been a moving target since Operation Midway Blitz was initiated in Chicago. ICE initially denied the Plaintiffs' request before the October 11 procession "due to safety and security concerns and the transitory nature of the BSSA [the Broadview facility]." ECF No. 1 ¶43. In response to an investigation by the *Chicago Tribune*, the Department of Homeland Security ("DHS") stated that the reason for the denial was that Plaintiffs "did not give the agency enough notice before coming," and that requests "must be approved by the Secretary of Homeland Security."[1] In Defendants' Response to Motion for Preliminary Injunction (the "Response"), the government said the reason was due to an influx of detainees' demands on the staff of Broadview, and that the denial was only temporary. Response at 4.

In December, after the bulk of federal agents stood down and left Chicago, and the number of detainees was no longer overwhelming, Plaintiffs made multiple timely requests to ICE to pray and offer detainees Communion on Christmas. Those requests were made by email, the U.S. Postal Service, and by hand to an ICE agent at the DHS/ICE Chicago field office (broadcast by local media). The government never responded to the requests either way. On the day the government filed its Response, asserting, for the first time, that the denials were only temporary, Plaintiffs were advised that, if so inclined, they should feel free to reach out to ICE again. Accordingly, Plaintiffs timely filed a request by email and express mail to the ICE's Chicago Acting Field Office Director on January 27, 2026, requesting access to Broadview on the feast of Ash Wednesday, February 18,

---

[1] Angie Leventis Lourgos, *Local clergy, faith leaders decry Trump's immigration crackdown: "Antithetical to the Gospel."* Chicago Tribune (Oct. 25, 2025); https://www.chicagotribune.com/2025/10/25/local-clergy-faith-leaders-decry-trumps-immigration-crackdown/.

2026, to provide ashes and Communion. *See* Ex. 1. On February 2, 2026, ICE denied the latest request on the grounds that "Broadview office is not a detention facility," and that "detainees spend very little time at the Broadview office." Ex. 2.

      For the 10 years that Sr. JoAnn Persch and Sr. Pat Murphy ministered inside Broadview, the facility was designated as a processing center, but that designation did not prevent them from accessing it. Before gaining access to the facility, Sisters JoAnn and Pat were given access to the buses used to transport detainees or deport them. The little time detainees spent on a bus before leaving Broadview did not prevent the Sisters' access. The various excuses the government has used over the last half year to deny access, both outside and inside Broadview, are spurious and pretextual in the face of the history of access to Broadview.

      The latest excuse in the Response is simply another government spin, straining to support an argument that the denial is based on a neutral restriction. Before the Response was filed, no one ever made such an argument in reply to Plaintiffs' requests for access. Indeed, government spokespersons tried to claim that members of religious groups had never been in Broadview. Now, when it is beyond peradventure that Sisters JoAnn Pesch and Pat Murphy were granted access inside Broadview for 10 years, and that priests, sisters, and laypersons had been praying in front of Broadview for over 15 years, the government tries this newly minted spin of a neutral restriction. However, there has never been anything neutral about the government's aim to ban religious expression or its message about the dignity of all human beings in Broadview.

      Indeed, the government did not, and still does not, want people of faith praying outside Broadview or ministering to detainees inside Broadview because the acts of prayer and ministry

are direct rebuttals of the government's claims that migrants "are not human, they're animals."[2] In contrast, Sr. JoAnn Persch's "ministry in Broadview always treated detainees as human beings, with dignity and respect." Declaration of Sr. JoAnn Persch, ECF No. 8-1 ¶ 12. Indeed, the Plaintiffs "see the detainees as our brothers and sisters in Christ. An immigrant or detainee is Christ, and we are called to visit and help them." Declaration of Michael N. Okińczyc-Cruz, ECF No. 8-2 ¶ 10. The government, therefore, employed spurious excuses as pretexts to purposely deny religious expression, which bears witness to the humanity of detainees.

Spokespersons for DHS and ICE continually refer to detainees in Broadview as the "worst of the worst" to give the impression that "most are killers, rapists and pedophiles who were running free,"[3] and justify the government's inhumane treatment of detained migrants. As *WGN-TV* noted, "the reality is far more nuanced" as the government was "forced to produce a list of people detained at the ICE processing center in Broadview, and it revealed that just 16 of 614 people were categorized by DHS as 'high public safety risks.'" *Id.* It also explained that "[M]any of the people now being arrested and deported were here under asylum claims and had been provided with temporary protected status under previous presidential administrations. Trump stripped that status, instantly removing protections for people who were following a legal process toward residency." *Id.*

---

[2] Nathan Layne, Gram Slattery & Tim Reid, *Trump calls migrants "animals," intensifying focus on illegal immigration*. Reuters (Apr. 3, 2024); https://www.reuters.com/world/us/trump-expected-highlight-murder-michigan-woman-immigration-speech-2024-04-02/.

[3] Ben Bradley, Local "Worst of the Worst" list includes serious crimes, also traffic and weed offenses. WGN-TV (Dec. 15, 2025). https://wgntv.com/news/wgn-investigates/local-worst-of-the-worst-list-includes-serious-crimes-also-traffic-and-weed-offenses/. *See also* FOX 32 Chicago, *DHS says Broadview ICE facility holds "the worst of the worst" as Pritzker criticizes Trump admin*. FOX 32 Chicago (Oct. 16, 2025); https://www.fox32chicago.com/news/broadview-ice-facility-immigrants-detained. *See also* Steven Harras, *DHS blasts order for improvements to migrant facility, says it houses "worst of the worst."* Catholic News Agency (Nov. 7, 2025) (stating Broadview "houses 'criminal illegal aliens' . . . described as 'some of the worst of the worst'"); https://www.ewtnnews.com/world/us/dhs-blasts-order-for-improvements-to-migrant-facility-says-it-houses-worst-of-the-worst.

Far from being a temporary event, DHS and ICE banned all religious expression at Broadview, declaring, "There is no more prayer in front of [the] building or inside the building because this is the state and it's not [of a] religious background." ECF No. 1 ¶ 59. The Assistant Director of DHS clarified that statement so as not to reference religious expression on any Illinois state property, explicitly noting that "ICE only restricts access to federal property inside and outside the facility." *Id.* The ban on prayer is not incidental to a neutral, albeit pretextual, rule, but was directed solely at prayer because of its "religious background," which acknowledges the humanity of detainees.

By demonizing migrant detainees as less than human, the government was saying migrant detainees are not entitled to human rights, much less any constitutional rights. It was attempting to gut a fundamental American principle, *i.e.*, the self-evident truth "that all men are created equal and . . . endowed by their Creator with certain unalienable Rights." *The Declaration of Independence,* para. 2 (U.S. 1776). People of faith, especially priests and sisters, praying outside and ministering to detainees inside Broadview directly rebuts the government's canard that detainees are not human, not worthy of our compassion, nor subject to any due process or justice. That is what the government's ban on praying outside and inside Broadview sought to stop, and the denials of access to Plaintiffs were not incidental, as the government now contends, but their objective.

## ARGUMENT

### A. Success on the Merits

The Seventh Circuit holds that a plaintiff must demonstrate that "its claim has some likelihood of success on the merits, . . . not merely a better than negligible chance." *Mays v. Dart*, 974 F.3d 810, 822 (7th Cir. 2020) (internal quotations and citations omitted). The necessary showing "depends on the facts of the case at hand because of our sliding scale approach." *Id.* Here, Plaintiffs have a high likelihood of success on the merits, as their claims rely on inconsistent statements by

4

the government that support multiple arguments for finding that its statements were not neutral or generally applicable, but were directed solely at Plaintiffs and people of faith, and that they banned religious expression. Further, the denial of access was discretionary, which triggers strict scrutiny, requiring the government to prove that the restrictions on prayer and Plaintiffs' access to minister to detainees in Broadview serve a compelling interest and are narrowly tailored to achieve that interest using the least restrictive means. Here, the government denies that its explanations for denying prayer in front of the Broadview ICE facility and denying access to the facility are subject to scrutiny, failed to consider the discretionary aspect of the denial, and did not offer any defense under the strict scrutiny standard. Accordingly, Plaintiffs have a high likelihood of success.

1. **First Amendment Free Exercise Clause**

The Free Exercise Clause of the First Amendment "prohibits the government from 'plac[ing] a substantial burden on the observation of a central religious belief or practice' without first demonstrating a 'compelling government interest justifies the burden.'" *St. John's United Church of Christ v. City of Chicago*, 502 F.3d 616, 631 (7th Cir. 2007). Here, the government declared there would be "no more prayer in front of [the Broadview ICE facility] building or inside the building," which created a "substantial burden" on Plaintiffs' religious faith to *stop, on shifting rationales,* the exercise of a core religious belief recognized by the United States Conference of Catholic Bishops. ECF No. 1 ¶¶38, 59. In denying access for prayer and pastoral care, the government initially said there are too many detainees to allow it; now, it says there are too few detainees to allow it. The government grasps at every possible rationale, even if they contradict each other, to claim they are acting "neutrally." It is not the number of detainees or issues of resources that drove the government's ban; rather, it is the elimination of prayer and pastoral care that bear witness to the humanity of the detainees.

Although the resolution of what is a religious belief or practice should not "turn upon a

5

judicial perception of the particular belief or practice in question," *Thomas v. Rev. Bd. of Ind. Emp. Sec. Div.*, 450 U.S. 707, 714 (1981), and although "courts should refrain from trolling through a person's or institution's religious beliefs," *Mitchell v. Helms*, 530 U.S. 793, 828 (2000), if a plaintiff shows "that a government entity has burdened [the plaintiff's] sincere religious practice pursuant to a policy that is not 'neutral' or 'generally applicable,'" then the court applies "strict scrutiny" to a claim that a plaintiff's Free Exercise Clause rights have been violated. *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 525 (2022) (quoting *Emp. Div., Dep't of Hum. Res. v. Smith*, 494 U.S. 872, 879-81 (1990)). The government's denials of access outside and inside Broadview were not neutral or incidental to a neutral restriction but aimed to stop Plaintiffs from bearing witness to the humanity of detainees, especially under the inhumane treatment of detainees and conditions of the facility.

Plaintiff Michael Okińczyc-Cruz has attested that, "[V]isiting the detainees, providing them with pastoral care, praying and administering Holy Communion to them are part of a long tradition of what Catholics have always done." ECF No. 8-2 ¶ 10. "As a Catholic, I believe that visiting immigrant detainees incarcerated by ICE is a tenet of my faith." *Id.* ¶ 24. "As a Catholic, I am called to minister to them, and doing so—performing this corporal work of mercy—is a religious practice of my faith." *Id.* ¶ 24. Moreover, Pope Benedict XVI has stated that "[A]mong the corporal works of mercy, the Church has always listed the visit to prisoners," before quoting the Gospel of St. Matthew, "and the Lord's words, by which he identified with inmates, that express the full meaning of my visit to [Rehibbia Prison] today. Wherever there is . . . a foreigner . . . a prisoner, there is Christ himself, who is waiting for our visit and our help." ECF No. 1 ¶ 39.

ICE's ban specifically targeted religious expression referenced by Mr. Okińczyc-Cruz and Pope Benedict XVI. Accordingly, the government is held to a "strict scrutiny" standard requiring it to demonstrate a compelling interest in the ban on prayer and that the ban is the least restrictive

6

means available to achieve that interest. The government did not proffer any compelling interest in the prohibition of prayer, nor did it demonstrate how it is the least means available. Indeed, the government completely ignores ICE's ban on prayer when it argues that Plaintiffs "were temporarily restricted from visiting the Broadview facility," (Response at 7) and acts as if ICE never made the declaration. The statement was not some neutral rule of general applicability but directed solely to prayer, *i.e.*, religious expression. Nowhere does the government state when or where the rule denying what it claims was temporary was established, or when the temporary restriction was adopted, and where it was incorporated into the rules governing the facility. There is simply no evidence to support who the restriction on access applied to, or that it was amended.

Incredibly, it appears the government's position now (Response at 8) aligns with this Court's findings, which led to the issuance of a Temporary Restraining Order on November 5, 2025, requiring the government to provide basic, humane conditions at Broadview. *See Gonzalez v. Noem,* Case No. 1:25-cv-13323 (RWG) (N.D. Ill. Nov. 5, 2025), ECF No. 48. Media reports noted that the Court found that Broadview was "no longer simply operating as a temporary holding center. 'It has really become a prison' . . . the sleeping conditions 'unnecessarily cruel' . . . 'It's just unacceptable.'"[4] Earlier, the government's position criticized the Court's findings: "Despite hoaxes spread by criminal illegal aliens, the complicit media, and now an activist judge, the ICE Broadview Facility does NOT have subprime conditions."[5] When it suits the government's narrative, findings of challenging conditions in "the related lawsuit now before this court" are the product of an "activist judge." When it seeks to spin the inhumane conditions as burdening ICE

---

[4] *Broadview ICE Facility Lacks Beds, Showers, Adequate Food as Federal Judge Indicates Temporary Restraining Order Likely*. WTTW News (Nov. 3, 2025); https://news.wttw.com/2025/11/03/federal-judge-hear-evidence-after-claims-inhumane-and-unlawful-conditions-broadview-ice.

[5] Federal Newswire, *DHS responds to criticism over ICE Broadview Processing Center conditions*. Federal Newswire (Nov. 5, 2025); https://thefederalnewswire.com/stories/676078691-dhs-responds-to-criticism-over-ice-broadview-processing-center-conditions

personnel, not the detainees, and it claims those burdens are related to "screening of visitors," "dedicated private space," and "monitor[ing] the visitation," without any evidentiary foundation or explanation. Response at 8.

Although there is no question that protesters engaged in aggressive acts outside the facility on specific days during the Blitz, what is most obvious to "[a]nyone who watched" (Response at 8) is the absence of any violence or other aggressive acts towards any government personnel during Plaintiffs' events. There is no record of riots, violence, or arrests outside the facility on October 11, 2025, when Plaintiffs held over a mile-long procession from St. Eulalia Church in Maywood to the Broadview ICE facility. Nor any record of any trouble outside the facility during the Mass on August 1, 2025. Indeed, during the Mass, volunteers with CSPL worked with the Broadview Police Department to keep Beach Street clear for ICE vehicles. The facts of those days do not support the government's position. As Sr. JoAnn Persch noted, when ICE refused access with no more explanation than a terse "safety and security," (ECF No. 1 ¶ 47) "Now, I want to know whose safety? Are we going to attack the immigrants? Are they going to attack me? I don't think so. Do they think coming with the Blessed Sacrament of the Catholic Church that we were going to attack them?" ECF No. 1 ¶ 52.

The government claims burdens on the small army of government agents assembled for Operation Midway Blitz justify denying Plaintiffs' First Amendment rights due to resource allocation problems. Response at 8. In addition to DHS and ICE, seven federal agencies, including Customs and Border Protection, deployed hundreds of federal agents, supplemented by hundreds of National Guard soldiers from the Illinois National Guard and the Texas Military Forces, for Operation Midway Blitz. In addition, the Illinois State Police and Broadview Police Department had officers working outside the facility. If the government were amassing such an army and expected massive seizures and arrests of people in the Chicagoland area, the influx of detainees should have

8

been expected, and resources had to be allocated to process detainees. Arguing now that an influx was unexpected and overwhelmed the ICE personnel processing detainees was the result of bad planning, or no planning for such a contingency, is an admission, at a minimum, of negligence. Moreover, DHS and ICE have increased budgets that belie an inability to have sufficient resources for processing detainees. The pretext of resource allocation problems does not absolve the government from the requirement to establish a compelling interest to impinge on Plaintiffs' First Amendment rights. Nor does the mismanagement of the "blitz" justify punishing Plaintiffs for the government's recklessness.

The government also ignores that it admitted that approval or denial of access was within the discretion of the DHS Secretary Noem. *See* Lourgos, *supra* note 1. The Secretary's discretion is a "mechanism for individualized exemptions," indicating that the government is failing to act neutrally. *Fulton v. City of Philadelphia*, 593 U.S 522, 533 (2021) (citing *Emp. Div., Dep't of Hum. Res. of Or. v. Smith*, 494 U.S. 872, 884 (1990)). Indeed, as *Fulton* counseled, "A longstanding tenet of our free exercise jurisprudence . . . is that a law burdening religious exercise must satisfy strict scrutiny if it gives government officials discretion to grant individualized exemptions." *Id*. at 544 (citations omitted) (Barrett, J., concurring). Accordingly, Secretary Noem's discretion to allow or deny Plaintiffs' requests for access triggers strict scrutiny, which the government has not satisfied. As such, there is a high likelihood of Plaintiffs' success on the merits.

### 2. Religious Freedom and Restoration Act

The RFRA creates a statutory right which provides "greater protection for religious exercise than is available under the First Amendment." *Holt v. Hobbs*, 574 U.S. 352, 357 (2015). The law prohibits the government "from imposing substantial burdens on religious exercise, absent a compelling interest pursued through the least restrictive means." *Tanzin v. Tanvir*, 592 U.S. 43, 45 (2020). That is so, "even if" the burden is based on "a rule of general applicability." *See Korte v.*

9

*Sebelius*, 735 F.3d 654, 671-2 (7th Cir. 2013) (citing 42 U.S.C. § 2000bb-1). Accordingly, [O]nce a RFRA claimant makes a prima facie case that the application of a law or regulation substantially burdens his religious practice, the burden shifts to the government to justify the burden under strict scrutiny." *Korte*, 735 F.3d at 673 (citing *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 428 (2006)). Even then, the government must explain why there is no less restrictive alternative than a total ban.

Here, the government burdened plaintiffs by pressuring them "to modify [their] behavior" and "render[ing] [their] religious exercise… effectively impracticable." *See Soc'y of Divine Word v. U.S. Citizenship & Immigr. Servs.*, 129 F.4th 437, 450 (citing *Korte*, 735 F.3d at 682). "In assessing whether a burden is substantial, we 'focus[] primarily on the intensity of the coercion applied by the government' and not the centrality of the religious practice in question." *West v. Radtke*, 48 F.4th 836, 845 (7th Cir. 2022) (citing *Korte*, 735 F.3d at 683).

The government completely denied plaintiffs' ability to exercise their faith via praying in front of the facility and ministering to detainees inside Broadview. Plaintiffs and others who prayed with them were forced to abandon their spot in front of the facility where they had been praying for over 18 years and had to move at least a block away, where they were unable to make visual contact with detainees being transported to other ICE facilities or being transported to an airport to be deported. Access inside the facility was denied entirely, and no accommodation was provided for Plaintiffs to pray with or provide pastoral care to detainees inside the facility. As the circuit court has noted, with respect to the RFRA, "Congress . . . expressly 'requir[ed] accommodation rather than neutrality.'" *Korte*, 735 F.3d at 671-2) (quoting *O'Bryan v. Bureau of Prisons*, 349 F.3d 399, 401 (7th Cir. 2003)).

To characterize the denial of their prayers and ministry as "a mere inconvenience" fails to understand the central role of the Corporal Works of Mercy in Catholicism. As noted, *supra* at 6,

the prayer and ministry to migrants and detainees are Corporal Works of Mercy in the Catholic Church, which are precepts imposed by natural law and a divine command in the Gospel of St. Matthew. ECF No.1 ¶ 39. As such, the denial to pray and minister to detainees "force[d] adherents of a religion [Plaintiffs] to refrain from religiously motivated conduct, inhibits or constrains conduct or expression that manifests a central tenet of a person's religious beliefs." *Mack v. O'Leary*, 80 F.3d 1175, 1179 (7th Cir. 1996) (interpreting RFRA), *vacated on other grounds by O'Leary v. Mack*, 522 U.S. 801 (1997). Indeed, each of the Plaintiffs, like Sisters JoAnn Persch and Pat Murphy, was ministering to migrants and incarcerated populations before 2025. They answered the call of their faith, which compelled them to such ministry.

The Complaint shows in some detail the individual prison and immigrant ministries of each Plaintiff before 2025. Each one had a vocation, a calling, at other facilities similar to Sr. JoAnn's and Sr. Pat's at Broadview. ECF No. 1 ¶¶ 13-18. This is why they did not seek access to Broadview earlier. At her advanced age, Sr. JoAnn, coming out of the pandemic, looked to pass the baton of ministering in Broadview to other members of CSPL, the Plaintiffs. She was in that process when she died shortly after signing her Declaration, and days before the case was filed.

Sr. JoAnn Persch continued praying in front of the facility as the pandemic subsided, until she was forced out by ICE. She was instrumental in each of the Plaintiffs' events, requesting access for the Plaintiffs and herself to minister to detainees, as she had done for 10 years prior to the pandemic. ECF No. 8-1. She was named as a plaintiff in the instant action until her death five days before the Complaint was filed, requiring that her name be withdrawn. The government's ban on praying and denial of access constrained her conduct and religious expression, as well as the Plaintiffs, imposing a substantial burden on them. It initially forced Sr. JoAnn, the Plaintiffs, and other Catholics who prayed in front of the facility down the street, where they had difficulty monitoring if detainees were being loaded on buses, much less expressing their compassion and blessings on

11

detainees. The denial of access did more than simply inhibit their conduct; it destroyed their ministry—their religious expression—which entailed pastoral care face-to-face with detainees, as Sr. JoAnn had done for years.

Pope Leo XIV cited the question Jesus said would be "posed at the end of the world: "How did you receive the foreigner, did you receive him and welcome him, or not? I think there is a deep reflection that needs to be made about what is happening." The Pope responded to the denials of access to Broadview citing "[i]nvit[ing] the authorities to allow pastoral workers to attend to the needs of those people, . . . . Many times they've been separated from their families for a good amount of time; no one knows what's happening, but their own spiritual needs should be attended to."[6] The government's Response says the denial is a "mere inconvenience" and tells the Pope and Plaintiffs to pray and minister to others elsewhere. Response at 8-9. It is cynical statement to a Christian because, as Pope Benedict stated, a foreigner and prisoner "is Christ himself." ECF No.1 ¶ 39. Ministering is not some transactional trade-off, and a person is not some fungible commodity. Plaintiffs cannot turn their backs and ignore the human dignity of detainees. Following the gospel and Pope Leo's counsel, they cannot but seek to provide pastoral care and prayer to people cut off from their families and community, facing deportation, and held in what this Court has deemed inhumane conditions. This is the moment when Plaintiffs need to express their faith through prayer and pastoral care to detainees, the majority of whom are Catholic, but without regard to their religion. (In Matthew 25:36, Jesus does not say embrace foreigners and prisoners, but only if they're Catholic.)

---

[6] Associated Press, *Pope Leo XIV calls on the Trump administration to allow detainees in Broadview to receive communion*. Chicago Tribune (Nov. 5, 2025); https://www.chicagotribune.com/2025/11/05/pope-leo-migrants/.

B. **Irreparable Harm**

The government's inconsistent explanations culminated in its admission of its total ban on religious expression: "There is no more prayer in front of [the] building or inside the building because this is the state and it's not [of a] religious background." *Supra* at 4; ECF No. 1 ¶ 59. The Assistant Secretary of DHS affirmed the total ban when she clarified that the ban covered all federal property at Broadview, "inside and outside the facility." *Id.* Whether considered under First Amendment principles or RFRA jurisprudence, Plaintiffs have demonstrated through the government's own words that it purposely denied Plaintiffs' rights to free expression of their religion, which caused a substantial burden on the exercise of their faith. The "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable harm." *Roman Catholic Diocese v. Cuomo,* 592 U.S. 14, 19 (2020). The facts here show that Plaintiffs have suffered irreparable harm.

As noted above, prior to the inception of Operation Midway Blitz, the government had said that migrants are "not humans, they're animals." *Supra* at 3. The government repeated its demonization of migrants throughout 2025, while forcing Plaintiff and others praying in front of the facility down the block, and fabricating explanations to justify denying access until it admitted that all religious expression was banned at the Broadview ICE facility. The admission that all religious expressions were banned at Broadview was neither neutral nor generally applicable, but was directed solely at religious expression, triggering strict scrutiny.

What the government calls a necessary and temporary restriction is but one of many explanations it has offered since October. The government does not proffer any evidence to support its latest claim, while earlier stating that the denial was due to untimely notice, which the Secretary of DHS had the authority to grant. There was no reference to any restriction being necessary or temporary. Indeed, if such a determination had been made, the government did not even produce

13

a facility handbook or a local supplement containing the facility's written policy and any amendment temporarily restricting it. The 2011 Performance-Based National Detention Standards, rev. 2016 (PBNDS). which the government cites in its Response at p. 11, applies to Service Processing Centers like Broadview, and requires adequate space and staffing for religious programs, as well as written procedures available to the public.

The government says that it is speculative to state that the restrictions on religious expression are permanent. Plaintiffs' attempts to get access to pray and minister to detainees on Christmas and Ash Wednesday prove otherwise. There was no longer an influx of detainees in December or January to justify the denial, as the government had earlier claimed. The government simply refused to respond to the Christmas request, and its latest denial says there are too few detainees now—a similar condition that existed for the 10 years during which Sr. JoAnn was granted access. The denials based on conflicting justification are evidence that the government still does not want people of faith praying or ministering to detainees, while the Secretary of DHS and other government spokespersons continue their demonization of migrants and detainees. The irreparable harm to Plaintiffs has not abated.

### C. *Jus Tertii* Standing

The Supreme Court has held that third-party standing is permissible and generally where "the party asserting the right has a 'close' relationship with the person who possesses the right," and "there is a 'hindrance' to the possessor's ability to protect his own interests." *Kowalski v. Tesmer*, 543 U.S. 125, 130 (2007) (quoting *Powers v. Ohio*, 499 U.S. 400, 411 (1991)). The Court notes that it has been "quite forgiving with these criteria" in the "context of the First Amendment." *Id*. citing *Secretary of State of Md.* v. *Joseph H. Munson Co.,* 467 U.S. 947, 956 (1984). Accordingly, the Court "has allowed standing to litigate the rights of third parties when enforcement of the challenged restriction *against the litigant* would result indirectly in the violation of third

14

parties' rights." *Id.* citing (*Warth* v. *Seldin*, 422 U.S. 490, 510, (1975) (emphasis added in *Kowalski*) (citing *Doe v. Bolton,* 410 U.S. 179 (1973); *Griswold v. Connecticut*, 381 U.S. 479 (1965); *Barrows* v. *Jackson*, 346 U.S. 249 (1953)).

Here, the government's denial of Plaintiffs' First Amendment and RFRA rights will result in a violation of detainees' rights. Without Plaintiffs having access to Broadview to pray with and minister to the detainees, they would have no religious services. There is no evidence that ICE provides detainees with a handbook, local supplement, or any written guidelines that would apprise them of their rights to practice their faith, even though ICE is required under the 2011 Performance-Based National Detention Standards, rev. 2016, to provide such information. Thus, a "lessening of the prudential limitations on standing," *Kowalski*, at 130, and the hinderance or obstacle caused by ICE not providing the required written standards to detainees, combined with the fact that both Plaintiffs and detainees are in the same zone of interests with respect to the vindication of both Plaintiffs and detainees' rights of free expression support Plaintiffs' having third-party standing to assert detainees' claims.

The government ignores the lessening of prudential limitations on standing articulated in *Kowalski* for First Amendment violations and would have this Court apply a standard unrelated to such claims. Supreme Court precedent, however, supports third-party standing here to redress both Plaintiffs' and the detainees' First Amendment and RFRA claims.

## **CONCLUSION**

For the reasons stated herein and in Plaintiffs' Motion for Preliminary Injunction, Plaintiffs request that the Court grant their motion for a Preliminary Injunction.

15

Dated: February 6, 2026	Respectfully submitted,

/s/ Thomas H. Geoghegan
Attorney for Plaintiffs

DESPRES, SCHWARTZ, & GEOGHEGAN, LTD.
Thomas H. Geoghegan
Will W. Bloom
77 West Washington Street, Suite 711
Chicago, Illinois 60602
Tel.: (312) 372-2511
tgeoghegan@dsgchicago.com

Patrick V. Dahlstrom, Esq.
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Tel.: (312) 377-1181
pdahlstrom@pomlaw.com

**Attorneys for Plaintiffs**

## CERTIFICATE OF SERVICE

The undersigned attorney hereby certifies that the foregoing document was filed and served on Defendants through the Court's CM/ECF system on February 6, 2026. Parties of record may obtain a copy through the Court's ECF system,

        Respectfully submitted,

        /s/ *Thomas H. Geoghegan* .
        Thomas H. Geoghegan