UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

COALITION FOR SPIRITUAL AND PUBLIC )
LEADERSHIP, FR. LARRY DOWLING, SR. JEREMY )
MIDURA, FR. DENNIS BERRY, FR. DAN )
HARTNETT, and MICHAEL N. OKIŃCZYC-CRUZ, )
)
     Plaintiffs, )
)
        v. )   No. 25 C 14168
)
MARKWAYNE MULLIN, TODD LYONS, MARCOS )   Judge Gettleman
CHARLES, RUSSELL HOTT, RODNEY S. SCOTT, )
TODD BLANCHE, U.S. DEPARTMENT OF )
HOMELAND SECURITY, U.S. DEPARTMENT OF )
JUSTICE, and DONALD J. TRUMP. )
)
     Defendants. )

**DEFENDANTS' RULE 59(e) MOTION TO AMEND**
**JUDGMENT GRANTING PRELIMINARY INJUNCTION**

This court recently ordered that pastoral care be allowed at ICE's Broadview facility on a

daily basis during the pendency of this litigation. Dkt. 36. Defendants now request that the order

be modified. New facts, arising out of the court-mandated Holy Week visits (April 2-5, 2026) and

the contemporaneously litigated conditions-of-confinement case (*Gonzalez v. Mullin,* 25 C 13323)

make clear that daily clergy visits at Broadview are unfairly burdensome. There is insufficient

space at Broadview for the type of private, hands-on pastoral care that plaintiffs seek to provide—

especially in light of the space needed for detention, consular official visitation, attorney visitation,

and a dedicated nursing station. Daily religious services reduce available security coverage and

disrupt time-sensitive processing operations, which are essential to maintaining safety, security

and orderly facility conditions. In a high-throughput processing environment like Broadview, such

disruptions increase the risk of processing delays, extended stays and, overcrowding. They also

strain the facility's ability to safely manage detainee movement and supervision. Furthermore,

plaintiffs' visits—which provide Christian religious services only—risk offending the Establishment Clause. For those reasons (described in greater detail below), the court should modify the preliminary injunction order.

## Background

At the beginning of this litigation, plaintiffs expressed a desire to return to the type of pastoral care that took place at Broadview from 2010 to 2020, when Sisters JoAnne Persch and Pat Murphy conducted *weekly* visits to the Broadview facility, meeting with detainees and their families at 4:00 a.m. every Friday. Dkt. 1 ¶ 33. Plaintiffs first requested injunctive relief in the form of an order requiring ICE to allow clergy visitation on Ash Wednesday, which the court granted. Dkt. 28. That single-day visit was conducted without issue.

### I. Holy Week visits

Plaintiffs then requested an order requiring clergy visitation during Holy Week (Holy Thursday through Easter Sunday), which the court also granted. Dkt. 33, 36. For those visits (four separate visits over four consecutive days), ICE performed advance security clearance for twelve different individual visitors. Dkt. 37, 38 (status reports regarding Easter visitation). On Holy Thursday (April 2, 2026), three clergy visitors were onsite at Broadview from about 3:30 p.m. to 4:30 p.m. Ex. A, Keith Taylor Declaration ¶ 6. There were approximately 13 detainees in custody. *Id*. Because of limited space, the visits were conducted in three smaller, separate groups, with each group limited to approximately five detainees. *Id*. Due to lack of available space, the detainee groups were escorted to the lobby area to meet with the clergy. *Id*. Each group spent approximately 20 minutes in the lobby area, with the full visitation process lasting approximately one hour. *Id*. Security protocols required the presence of two deportation officers, one positioned on the secured side of the lobby and the other on the opposite side. *Id*. The Holy Thursday visit

2

coincided with the Mexican consulate's scheduled time to meet with detainees, and the consulate's access was delayed from 3:00 p.m. until approximately 5:00 p.m. *Id*.

The next day (April 3, 2026), three clergy visitors arrived, again at approximately 3:30 p.m. *Id*. at 3. There were seven detainees present at the facility, and three opted to participate in religious services. *Id*. Two ICE officers were assigned to facilitate and monitor the clergy visits. *Id*. The visitors brought religious materials, including a case of bibles, water basins, and a religious statute (approximately 2 to 3 feet tall), which were all screened and accommodated for the purposes of the visit. *Id*. Bibles provided by the visitors were placed among the personal property of the detainees that opted to participate in the visit. *Id*. With respect to the water basins, to accommodate plaintiffs' request, ICE officers had to open the locked lobby area door to allow the visitors to wash the feet of the detainees that opted to participate. *Id*. Additional time and staffing were required to assess security considerations, including scanning of religious items through the X-ray, which diverted personnel and introduced unplanned security considerations into an already constrained operational environment. *Id*. Those religious items were neither identified in advance of the visit nor during pre-visit coordination discussion. *Id*.

On April 4, 2026, the visit was again conducted from approximately 3:30 p.m. to 4:30 p.m. *Id*. at 3. There were approximately three detainees in custody and two elected to participate. *Id*. The visit was conducted in a single group, and all detainees had been processed prior to the visit. *Id*. at 3-4. Although the visit was scheduled for one hour, it lasted approximately 40 minutes. *Id*. at 4. Consistent with prior visits, security protocols required the presence of two ICE officers at all times, one positioned on the secured side of the lobby door and one on the opposite side. *Id*.

Finally, on Easter Sunday (April 5, 2026), clergy visitation was conducted from approximately 3:30 p.m. to 4:30 p.m. *Id*. at 4. There were thirteen detainees in custody, and two

3

elected to participate. *Id*. The visit was conducted as a single group. *Id*. Consistent with prior visits, security protocols required the presence of two ICE officers at all times, one positioned on the secured side of the lobby door and one on the opposite side. *Id*. On this date, accommodations were also made for the sacrament of confession by utilizing a visitation area, while detainees and plaintiffs were separated to allow for privacy while maintaining security. *Id*.

During each of the Holy Week visits, ICE was required to divert essential personnel away from processing work. Approximately four to five officers were assigned to each relevant shift, two of whom were required to support visitation activities, as noted above. *Id*. ¶ 7. This diversion of personnel limited the facility's ability to maintain normal operational coverage across intake, escort, and security posts, and increased the strain on remaining staff responsible for time-sensitive processing functions. *Id*. Also, as noted, the visits at times coincided with the Mexican consulate's scheduled times to meet with detainees, and the consulate's access was delayed on one occasion for two hours until approximately 5:00 p.m. *Id*.

## II.    *Gonzalez v. Mullin* Litigation

Daily pastoral visitation is also complicated by the space and resource demands arising out of the *Gonzalez v. Mullin* litigation. *See* No. 25 C 13323, Dkt. 1 at 71-74. That case concerns Broadview holding room capacity limits, attorney visitation, detainee access to phone time/private space for attorney phone calls, and the provision of medical care. *Id.* Addressing the concerns of the plaintiffs in that litigation will require reallocation of space for private medical assessments and private attorney meetings/phone calls (rendering space for pastoral care less available than ever). And it will require more demands on Broadview's personnel, requiring them to implement additional steps in their detainee intake and processing work, all while exacerbating the urgency of timely processing (to avoid the type of overcrowding claims that gave rise to the lawsuit). These

emerging demands on Broadview's space and personnel complicate ICE's ability to facilitate daily religious services.

**Legal Standard**

Where a motion to alter or amend a preliminary injunction order is filed within 28 days of the order, it is governed by Rule 59(e). *See* Fed. R. Civ. P. 59(e); *Fin. Servs. Corp. of Midwest v. Weindruch*, 764 F.2d 197, 198 (7th Cir. 1985) (noting that "an order granting a preliminary injunction is a judgment within the meaning of" Rule 59(e)). A motion for reconsideration under Rule 59(e) is appropriate where the moving party can "clearly establish" that "there has been a manifest error of law or fact." *Harrington v. City of Chi.*, 433 F.3d 542, 546 (7th Cir. 2006). Rule 59(e) motions perform "a valuable function where the Court has patently misunderstood a party, or has made a decision outside the adversarial issues presented to the Court by the parties, or has made an error not of reasoning but of apprehension." *Bank of Waunakee v. Rochester Cheese Sales, Inc.*, 906 F.2d 1185, 1191 (7th Cir. 1990) (internal quotation and citation omitted). "The rule essentially enables a district court to correct its own errors, sparing the parties and the appellate courts the burden of unnecessary appellate proceedings." *Russell v. Delco Remy Div. of Gen. Motors Corp.*, 51 F.3d 746, 749 (7th Cir. 1995). "However, it is well-settled that a Rule 59(e) motion is not properly utilized to advance arguments or theories that could and should have been made before the district court rendered a judgment." *Sigsworth v. City of Aurora, Ill.*, 487 F.3d 506, 512 (7th Cir. 2007) (internal quotation and citation omitted).

**Argument**

The court should reconsider its April 7, 2026 preliminary injunction ruling because, at the time it was entered, the court did not have the benefit of a thorough account of the operational demands and constitutional complications of daily clergy visitation on the facility. New information (from both the Holy Week visits in this case, as well as developments in the *Gonzalez*

5

case) make clear now that Broadview lacks sufficient space or personnel to run an in-depth religious service program (one that would cater to all faiths). Visitation of the type the court has ordered (daily Christian ministry) poses undue burdens for the agency and also risks running afoul of the Establishment Clause. For those reasons, the agency has a compelling interest in maintaining its pre-injunction practice: limiting pastoral visitation at *processing* facilities like Broadview (where detainees are present for a matter of hours), and instead providing a full range of religious services (for all faiths) at its *detention* facilities, where detainees are expected to stay overnight. For those reasons (described in additional detail below), the court should modify its order and deny plaintiffs any preliminary relief.

**I. Daily Clergy-Initiated Visits Burden Broadview's Space and Personnel.**

This court has already concluded that the blanket denial of clergy-initiated religious visitation at Broadview substantially burdens plaintiff's religious exercise. But that is not enough to justify an injunction under the Religious Freedom Restoration Act. If the government is likely to establish that its practice (1) furthers a compelling governmental interest and (2) is the least restrictive means of furthering that compelling governmental interest, an injunction would be inappropriate.

In this case, the government's restriction on clergy-initiated visitation at Broadview—coupled with its provision of a full range of religious services in ICE detention facilities—furthers a few compelling interests. First, it allows Broadview's small group of personnel to engage more fully in *processing* of detainees, which promotes the detainees' timely movement through the facility to a detention facility where religious services are more equitably available, thereby reducing the risk of uncomfortable overnight detention and overcrowding. As noted above, there are typically only four or five officers present at Broadview at any given time, and clergy visitation

requires that two of those officers be pulled away from processing work for the duration of the visit. That personnel diversion compounds the risk of overnight detention and overcrowding.

Second, the government restriction on clergy-initiated visitation in *processing* facilities allows for Broadview's limited square footage to be appropriately allocated: confidential space for attorney counseling and consular visitation, private space for medical screening, and designated spaces for classified holding (including separation of men and women and separation of detainees with special needs or vulnerabilities). There simply is not additional space to dedicate to religious services, which is why Broadview's personnel resorted to hosting the court-ordered Holy Week visits in the lobby area and in hallways. These space constraints are likely to intensify as the *Gonzalez* litigation progresses, because the conditions that are being demanded in that case are inherently space-intensive. *See* No. 25 C 13323, Dkt. 1 at 71-74 (relief requested).

And third, the restriction allows ICE to facilitate a religious services program that more deliberately and comprehensively caters to the diverse religious needs of detainees. A processing facility that houses detainees for a matter of hours (not days) cannot reasonably accommodate a wide range of faiths and religious observances within its limited space and staffing constraints. By contrast, detention facilities—where stays are longer and space is more ample—can. At that is exactly what ICE does; it requires the following for all detention facilities: "All religions represented in a detainee population shall have equal status without discrimination based on any detainee's race, ethnicity, religion, national origin, gender, sexual orientation or disability" and also that "Each facility's religious program shall be planned, administered and coordinated in an organized and orderly manner" and "adequate space, equipment and staff (including security and clerical) shall be provided for in order to conduct and administer religious programs." *See*

Performance-Based National Detention Standards (PBDNS) revised 2016, § 5.5, Religious Practices.[1]

Because the government has compelling interests in the status quo (restricted clergy-initiated visitation in processing facilities for all faiths, but comprehensive religious services in detention facilities), and because there is no less-restrictive means of furthering those interests, plaintiffs are unlikely to succeed on the merits of the RFRA claim and the injunction should be lifted.

## II.    Christian-Only Visitation Threatens the Establishment Clause.

Plaintiffs' Christian-only ministry at Broadview also threatens violation of the Establishment Clause.   The Establishment Clause of the First Amendment provides that government agencies may not coerce anyone to support or participate in religion, or otherwise act in a way that tends to "establish" any one religion.  *Lee v. Weisman,* 504 U.S. 577, 587-593 (two minutes of non-denominational prayer to captive audience of high school students violated the Establishment Clause).   The rule requires government agencies to pursue a course of neutrality toward religion, favoring neither one religion over others. *Bd. of Educ. of Kiryas Joel Vill. Sch. Dist. v. Grumet*, 512 U.S. 687, 696 (1994) (holding that school district violated Establishment Clause by drawing school attendance boundary to effectively allow separate schooling for orthodox Jewish community).  Put simply, "civil power must be exercised in a manner neutral to religion." *Id.* at 704; *Larson v. Valente,* 456 U.S. 228, 244 (1982) ("one religious denomination cannot be officially preferred over another").

In this case, daily attendance of Christian clergy at Broadview, coupled with the court's requirement that the clergy be allowed to address captive audiences of detainees (*see* Dkt. 36 at 6

---

[1]  ICE's policy on religious practice does not apply to facilities categorized as "service staging facilities," like Broadview.

¶ 8), puts ICE in the untenable position of tending to *establish* Catholicism, or at least Christianity, as the religion at Broadview. The risk is especially acute because, as noted above, Broadview personnel have been facilitating plaintiffs' religious ministry in the lobby area or in a hallway near the lobby area, making their presence visible to everyone moving in or out of the facility. That holding-out of the Christian religious service providers, without offering anyone to serve non-Christian detainees, puts ICE at risk of an Establishment Clause violation claim.

### Conclusion

For the forgoing reasons, the court should reconsider its ruling on plaintiffs' request for a preliminary injunction and lift the injunction during the pendency of this litigation.

Respectfully submitted,

ANDREW S. BOUTROS
United States Attorney

By: s/ Sarah F. Terman
 SARAH F. TERMAN
 Assistant United States Attorney
 219 South Dearborn Street
 Chicago, Illinois 60604
 (312) 469-6201
 sarah.terman@usdoj.gov

9